**In re WINSTON MILLS, INC., Debtor.**

**Bankruptcy No. 78–B–961.**

United States Bankruptcy Court, S. D. New York.

Oct. 15, 1980.

Levin & Weintraub, New York City, for debtor; Elias Mann, Marilyn Simon and Barry N. Seidel, New York City, of counsel.

Anderson, Russell, Kill & Olick, P. C., New York City, for Indenture Trustee, as claimants; Arthur S. Olick and Tina L. Wellner, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

Winston Mills, Inc. (Winston or debtor) came to this court on May 22, 1978 by filing its petition seeking an arrangement under Chapter XI of the now–repealed 1898 Bankruptcy Act.[1] Sections 301 *et seq.*, 11 U.S.C. (1976 ed.) §§ 701 *et seq.* On that filing, the company became a debtor in possession able to exercise "all the powers of a trustee" under Section 342. As such, it began this dispute by filing its objection, and then its amended objection, to separate claims filed by United American Bank (UAB) entered as No. 330 on this court's claims dockets, and to that filed by the First Bank of Milwaukee (FBM) entered as No. 421 on those dockets. By its amended motion objecting to the UAB claim filed for over $2,400,000. and to the FBM claim filed for

just under $1,400,000., the debtor seeks an order reducing these claims in substantial amounts. Before turning to the legal positions taken by the parties, how they came to their undisputed factual relationship should be addressed. And so the court turns first to that.

This debtor, Winston, is the unconditional guarantor of two Lease Agreements, one dated October 1, 1972, the other January 1, 1973, executed between Winston's wholly–owned subsidiary, Win–Tex Knitting Mills, Inc. (Win–Tex) and the Industrial Development Board of the County of Cocke, Tennessee (IDB). Pursuant to the terms of the first, Win–Tex leased manufacturing facilities comprised of certain lands, buildings, machinery and equipment (leased facilities). Under the second lease, Win–Tex received additional knitting machines. It filed a voluntary liquidation petition on December 4, 1979, and is therefore a Chapter 7 debtor under the 1978 Bankruptcy Code applicable to cases filed on or after October 1, 1979. Section 402(a), Title IV.[2]

The purchase and construction of the properties contained in the two leases to Win–Tex were financed by the IDB, which issued revenue bonds, and secured repayment of these bonds by assigning all of its right, title and interest in the leases as well as Winston's guarantees thereof to the predecessors–in–interest of the claimants here, as Indenture Trustees. Such is the status of these claimants.

Debtor rests its amended objection by which it seeks reduction of UAB's claim No. 330 to $469,542.52, and reduction of FBM's claim No. 421 to $635,406.67, on a variety of legal theories. In brief, debtor seeks to separate the first lease into a lease of real estate and a lease of equipment. From this

---

1. By virtue of Section 403(a) of Title IV of the 1978 Bankruptcy Reform Act, the new Code, effective from October 1, 1979, does not apply to this debtor, whose "case was commenced under the [1898] Bankruptcy Act" and this dispute must therefore be dealt with as though the 1978 Act had not been enacted. See *Guardian Mortgage Investors v. Unofficial Noteholders–Debentureholders, etc.,* 607 F.2d 1020 (2d Cir. 1979) at fn. 6; *Matter of Becker's Motor Trans-*

*portation, Inc.,* —— F.2d —— (3d Cir. Sept. 4, 1980, No. 79–2796).

2. As seen, Win–Tex's parent is a Chapter XI debtor under the 1898 Act. In the 1978 statute, it would be a debtor under Chapter 11, Sections 1101 *et seq.*, a statutory scheme featuring a blend of Chapters X, XI and XII of the 1898 Act.

premise, it is argued that in light of the Win–Tex filing under the 1978 Code, Section 502(b)(7) of that statute, 11 U.S.C. § 502(b)(7), limits the claim for allowable damages against the primary lessee of a lease of real estate and, it follows, therefore, limits the claim which may be asserted against the guarantor of the lease.

The debtor's amended objection to the "equipment" portion of the UAB claim argues that a claim for the balance remaining due there must be discounted by 17% to reflect the present value of future rental payments due, and further reduced by deducting the proceeds of the sale of the equipment in which this claimant admittedly had a perfected security interest.

As to FBM's claim, the debtor argues that the outstanding balance there must also be discounted by 17% to reflect the present value of future payments, and similarly would subtract the proceeds received by this creditor from the sale of the collateral, also subject to its perfected security interest.

Both claimants filed an answer to Winston's objection. As an affirmative defense to the objection, UAB alleges that the lease in question is a financing lease not subject to limitation by Section 502(b)(7), and that, in any event, Winston waived the assertion of limitation by the terms of its guarantee agreement. As a second affirmative defense, UAB alleges that the accelerated "rental" payments on this financing lease are not subject to present value discounting, that in any case a 17% discount rate is excessive and burdensome, and finally, that Winston agreed to pay all unpaid installments of rent (a term defined in the lease) as liquidated damages.

FBM presses the same defenses to the debtor's attacks on its claim. Both claimants therefore conclude that the debtor's objections should be overruled and that their claims should be reduced only by their realizations on the collateral. Excluded from the amounts so realized, UAB and FBM insist, should be their reasonable expenses and counsel fees.

Claimants filed a joint motion for summary judgment under Rule 56, F.R.Civ.P., made applicable by Rule 756, 411 U.S. 1084, 93 S.Ct. 3159, 37 L.Ed.2d lxxii, to the kinds of bankruptcy court disputes described by Rule 701, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi, which this is not, and to contested matters described by Rule 914, 411 U.S. 1098, 93 S.Ct. 3170, 37 L.Ed.2d lxxviii, which this is. The foregoing bankruptcy rules apply in this Chapter XI case by operation of Rules 11–61 and 11–63, 415 U.S. 1037, 1039, 94 S.Ct. 3258 & 3259, 39 L.Ed.2d lii. This motion is supported by exhibits, affidavits, and a statement of the material facts not in dispute. In short, claimants insist that in the absence of genuine issues as to the material facts, they are entitled to judgment as a matter of law, that their claims must stand for they are said to be founded on financing leases intended as security and not subject to the limitations set forth in Section 502(b)(7) of the Code, not subject to discounting to present value, and not susceptible of reduction save in the net amount of the proceeds of sale after deduction of expenses, fees, etc.

Debtor has cross–moved for summary judgment in its favor. It, too, alleges the absence of a dispute as to the material facts but insists that the law supports the objection to the claims. This Chapter XI debtor was and is in the business of manufacturing and distributing knit fabrics for use in the garment industry. In the early 1970's, the Industrial Development Board of the County of Cocke, Tennessee, a public, non–profit corporation, was established under Tennessee law [3] to "acquire, own, lease, and dispose of properties to the end [of promoting] . . . industry and develop[ing] trade by inducing manufacturing, industrial and commercial enterprises to locate in or remain in the State and further the use of its agricultural products and natural resources." [4]

In accordance with this expression of its corporate purpose, the IDB entered into a

---

3. Title 6, Chapter 28, Section 6–2801, *et seq.* of the Tennessee Code Annotated.

4. October 1, 1972 Indenture of Mortgage and Deed of Trust at p. 1.

lease agreement dated October 1, 1972 (Lease A) with Win–Tex,[5] to induce it to locate in Tennessee and to operate a manufacturing plant in that state. To achieve this end, the IDB did acquire real estate, and agreed to "acquire and construct thereon a manufacturing plant and related facilities including machinery and equipment" all to be leased to Win–Tex.[6] To provide the wherewithal for its ambition, the IDB issued bonds, identified as "The Industrial Development Board of the County of Cocke, Tennessee First Mortgage Revenue Bonds, Series A (Win–Tex Knitting Mills, Inc.—Lessee)" (Series A Bonds) in the principal amount of $2,000,000. Payment was secured by the IDB's execution of an Indenture of Mortgage and Deed of Trust, also dated October 1, 1972, under which the lease and all rights in the leased property, the rental payments and the Winston guarantee were pledged and assigned to the Hamilton National Bank as Indenture Trustee (Trustee) and subsequently to its successor, claimant UAB.

The Indenture Agreement recited on p. 3 that:

" . . . this Series A Bond is payable solely out of the revenues and receipts derived from the leasing or sale by the Board of a manufacturing plant and related facilities including machinery and equipment which are to be acquired, constructed and installed on certain real property of the Board . . . and as of the date of the issuance of the Bonds were leased to Win–Tex Knitting Mills, Inc. . . . . The rental to be paid by Win–Tex Knitting Mills, Inc., for the lease of the facilities has been assigned to the Trustee as further security for the Bonds, and such rental is sufficient to pay the principal of and interest on the Bonds as the same become due and payable. Winston Mills, Inc. . . . has guaranteed . . . the payment of all rents . . . under the Lease."

Sections 2.01 and 2.02 of Lease A between IDB and Win–Tex contain the basic representations as to the intentions and purpose of the parties in entering upon the lease. Section 2.01 states that:

"(b) The Lessor has acquired the Leased Land and certain Facilities located thereon, and has authorized . . . the Lessee to construct thereon the Facilities constituting a manufacturing plant and related facilities, to acquire and install the Equipment in the Facilities or on the Leased Land, and to acquire, install and construct all other things deemed necessary in connection with the Leased Premises . . . *and the Lessor proposes to lease the Leased Premises to the Lessee and to sell the Leased Premises to Lessee at the expiration or earlier termination of the Term . . . .*",

and that

"(c) Heretofore, Lessor and Lessee did agree that Lessor would finance the cost to be incurred by the Lessor or the Lessee in acquiring, constructing and equipping the Leased Premises. The Lessee has determined that such cost . . . is equal to $2,000,000. and on that basis Lessor now proposes to issue the Series A Bonds in the aggregate principal amount of $2,000,000." (emphasis added)

Subsections (c) and (d) of Section 2.02 recite in relevant part, that:

"The Lessee intends to operate the Leased Premises as a manufacturing plant . . . . The acquiring, constructing and equipping of the Leased Premises by Lessor through the issuance of the Series A Bonds and the leasing of the Leased Premises to Lessee has induced Lessee to establish this industrial enterprise in the State of Tennessee."

Certain crucial definitional terms used by the parties to Lease A must be set out here. "*Leased premises*" was defined to mean the Leased Land, the Facilities and the Equipment. "*Leased Land*" was defined to mean the real property purchased by IDB

---

5.  As seen, *supra*, Win–Tex Knitting Mills, Inc. is a wholly–owned subsidiary of Winston Mills, Inc. and is itself in liquidation under Chapter 7 of the 1978 bankruptcy statute.

6.  Footnote 4, above.

and described in Schedule A attached to the lease. *"Facilities"* meant buildings, structures and all other facilities forming a part of the leased premises, and located on the leased land together with the buildings, structures and all other facilities required to be constructed and equipped on the leased land ... including any air conditioning and heating systems (which were to be deemed fixtures). *"Equipment"* was said to mean those items of machinery, equipment and related property which had to be acquired with the proceeds from the sale of the bonds and installed in the facilities or elsewhere on the leased land, as described on Schedule B of Lease A. *"All Unpaid Installments of Rent"* was defined to mean an amount equal to the entire principal amount of the then outstanding bonds together with any applicable redemption premiums and all interest accrued or to accrue less moneys available for redemption then held by the Trustee, plus any additional rental due or to become due including, without limitation, any unpaid fees and expenses of the lessor or the Trustee then due or to become due prior to the time that the bonds were paid in full and the trust established by the Indenture terminated. These definitions are found in Lease A, § 1.02; see also Lease B, § 1.02.

Winston's guarantee executed October 1, 1972 was of integral importance to the transaction described. It was delivered to the IDB and subsequently transferred to the Trustee. By relevant language, Winston bound itself to "unconditionally guarantee" all obligations of the lessee (Win–Tex) including "the payment of rent and other amounts reserved under the Lease so long as any of the Bonds and interest coupons ... remain 'outstanding' ...." and to pay these upon Win–Tex's default.

By § 2.5 of its guarantee agreement, Winston covenanted that:

"... it is specifically understood that any modification, limitation or discharge of the Company's [Win–Tex's] liability under the Lease arising out of or by virtue of any bankruptcy ... proceeding ... shall not affect, modify, limit or discharge the liability of the Guarantor in any manner whatsoever and this Guaranty Agreement shall remain and continue in full force and effect and shall be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceedings had not been instituted; and it is the intent and purpose of this Guaranty Agreement that the Guarantor shall and does hereby waive all rights and benefits which might accrue to it by reason of any such proceeding and that it shall be liable for the full amount of rent and other sums, including all damages imposed, or payable under the terms of the lease ...."

The parties agree that the leases were "net leases". Under Lease A the lessee assumed absolutely virtually all risks and obligations normally associated with ownership of the lessee to repair damage to or destruction of the premises, loss or theft of equipment, and with the obligation to rebuild at its own expense if the premises were destroyed while any indebtedness on the bonds was outstanding. See Sections 4.01, 5.01, 5.02, 6.02, 6.04, 10.03, 12.01 of Lease A; similar provisions are contained in Lease B.

The original term of Lease A was until September 30, 1992, with automatic renewal to follow for four five–year periods, §§ 3.06, 3.07. The total rent reserved (principal plus interest) amounted to $3,463,012.50, with a schedule of yearly rental payments set forth in Schedule C of the lease.

The terms of Lease B, executed on January 1, 1973, between IDB and Win–Tex, were substantially similar to Lease A, but the underlying need differed. In order to finance the acquisition of 45 knitting machines for use on the leased premises, the IDB issued another series of bonds in the aggregate principal amount of $2,000,000. and assigned as security Lease B, Winston's unconditional guarantee executed January 1, 1973, and executed another Indenture and Security Agreement (Trust Deed) dated January 1, 1973 for the benefit of the bondholders of designated "Revenue Bonds (Win–Tex Knitting Mills, Inc.—Lessee)."

Claimant FBM is the successor Indenture Trustee.

This lease, also a net lease, placed all apparent burdens of ownership on Win–Tex as lessee, and financing statements were filed in accordance with Tennessee's version of the Uniform Commercial Code (U.C.C.). The terms of Lease B, clearly an equipment lease, ran from January 1, 1973 through December 31, 1982. Total rent was set at $2,844,125.00 by Schedule C of Lease B.

Win–Tex defaulted on the payments called for by Lease B on December 12, 1977, and on the payments under Lease A about three months later. The balance due on Lease B was $1,429,087.50 and on Lease A, $2,330,356.25. Notice of default and of consequent acceleration of payments due was timely sent by the Indenture Trustees to Winston, to Win–Tex, and to the IDB. In due course, Winston and Win–Tex notified the Indenture Trustees and the IDB of their intention to abandon the properties. In May, 1978 Winston came to this court as a Chapter XI debtor. By order entered July 18, 1978, this court authorized the sale by Winston, as debtor–in–possession, of certain equipment with the proviso that any liens thereon would attach to the proceeds which were placed in escrow pending this court's determination of the validity, priority and extent of any secured claims. Ultimately, UAB received $21,677.53 representing the proceeds from the sale of the equipment subject to its lien. FBM received $67,480.74. UAB holds title to the manufacturing plant.

FBM's proof of claim credited the debtor with reduction of its liability by only the net proceeds realized from the sale of its collateral. FBM came to this by first deducting from the gross proceeds of the Lease B equipment money said to be proper charges for fees, costs, expenses, insurance and safeguarding charges as provided in the Indenture.

None of this recital of what this court perceives to be the controlling facts is in dispute. Indeed, with the commendable candor which both sides showed in this complex and vexing dispute, neither questioned the Rule 9(g) allegations of the other nor that they were congruent. They differ only in their disparate views of the legal consequences flowing from these facts.

The primary disparity between the parties rests on the debtor's characterization of Lease A as divisible into a lease of real estate and a lease of equipment, with the equipment lease to expire on September 30, 1982; and the real estate lease on September 30, 1992. The debtor offers this perspective by pointing to the separate rentals for each set forth in Schedule C of Lease A, a view bolstered, it is urged, by the execution of Lease B, a pure equipment lease with expiration date at the end of 1982. The debtor argues that its legal view if inevitable if proper scrutiny is given to the Lease A rental schedule. That schedule (Schedule C) shows that for the first ten years, the yearly rentals range between $214,000. and $218,000. From March 21, 1983 until the end of the term the yearly average rental was fixed at $128,000. So, it is argued, the court must assume that because of the substantial reduction in yearly payments between the two ten–year periods, the first ten–year period under the lease must reflect payments covering both the equipment and the real property, while the second ten–year period reflects payment of rent on only the real estate. Accordingly, the debtor, having divided the lease into two parts, asks the court to arrive at a balance due on the "equipment portion" of $399,043.75 and $1,931,312.50 due on the real estate. On this allocation, the debtor says it is liable on its guarantee of the real estate liability only to the extent that Section 502(b)(7) of the 1978 Code would allow the claim of Win–Tex's landlord for damages resulting from termination of its real estate lease with that debtor. Section 502(b)(7) allows such a landlord's damage claim if it does not exceed

"(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;"

If that statute applies here, as the debtor views Lease A, then it is clear that the UAB claim far exceeds the limitations of the above section relevant to allowable damages flowing from termination of real estate leases.

The first and main issue thus presented is, to borrow the finely honed thought of Circuit Judge Oakes the other day in another context, *Barry Kieselstein–Cord v. Accessories By Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980), "on a razor's edge" of lease financing law. "We say 'on a razor's edge' because the case requires us to draw a fine line" in a vexing area of commercial law where so much depends on the relationship of the parties at the inception of their relationship, what they thought they were doing and why, the words they used to achieve their supposed ends, and, to the extent courts have spoken, the legal implications of the words and the divining of what the parties intended.

Narrowly phrased, this first issue is whether Lease A is an indivisible "installment sale" of real and personal property masquerading as a lease.

There is no question between the parties that the IDB was a secured creditor as to the equipment covered by that lease and Lease B, having duly perfected its security interest and therefore entitled to satisfaction of its debt from the proceeds of the sale of its personal property collateral. However, as to Lease A, UAB insists that as IDB's assignee it is totally secured and is not a landlord. So, it concludes it it entitled to the full amount of the "rent reserved" or, alternatively, to liquidated damages as provided for, less "rent" already

paid without concern as to limitations applicable by statute only to landlord damages.

Looking to the economic substance of the Lease A transaction, several facts emerge. The IDB was not then, and is not now, in the business of owning and operating manufacturing plants, or of leasing equipment for profit. Its *raison d'etre* has already been quoted. The "rental payments" were, in fact, absolute obligations of Win–Tex, unconditionally guaranteed by Winston. These payments were carefully keyed to principal and interest payments due on the bonds. § 4.01. Win–Tex was to make its payments directly to the Indenture Trustee; and upon default, unmade payments were to be accelerated and to become due, not a feature typical of true landlord–tenant leases. § 3.2 of the Agreement of Guarantee.

In reality, the bondholders' money financed Win–Tex's acquisition of land, buildings and equipment for its Tennessee operations, something far different than a true lease of land and something more as to everything else covered by Lease A as the debtor presses.[7]

The limitations expressed in Section 502(b)(7) of the 1978 Code and Sections 63(a)(9) and 353 of the 1898 Act, 11 U.S.C. (1976 ed.) §§ 103a(9) and 753, were considered to be equitable as applied to landlord claims arising from the termination of leases with debtor/bankrupts or debtors so that large damage claims by landlords from termination of long–term leases should not take most, if not all, of the assets to the exclusion or intolerable diminution of other creditors, particularly as the landlord would have regained his asset, re–entered and re–let to a solvent lessee. An additional element of this theory was that the landlord–tenant relationship kept title to the property in the landlord who bore all the attendant risks and benefits of ownership. See *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 919–920 (2d Cir. 1944).

---

7. As Lease A already took care of Win–Tex's land needs, the content of Lease B, covering a need only for a substantial number of knitting machines when knit goods were more in vogue than they are now, is neutral on the issue of the reach of Lease A. Lease B is relevant here only on the issue of the extent of the other claim under objection by Winston.

In the legislative process which led, ultimately, to enactment of the 1978 bankruptcy reform legislation, both the Senate and the House recognized the need to deal with the damage claims of landlords under true leases although Section 502(b)(7) emerged somewhat different than the earlier versions to which both were speaking at the time. See Sen.Rep. No. 95–989 to accompany S.2266, 95th Cong., 2d Sess. 63–64 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; House Rep. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. 353–354 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.[8]

But regardless of how the Senate and the House reconciled their views on the allowable claim of a landlord under a true lease in Section 502(b)(7) of the Code, it is clear that that section proposed to retain the distinction shown by the cases between such leases and the so–called "financing lease" or "lease intended as security", transactions not subject to limitation. See Sen.Rep. No. 95–989, *supra,* at 64. While the House Report No. 95–595, *supra,* did not speak to this point, both chambers expressed these identical thoughts as revised H.R. 8200 drew close to passage:

"However, these considerations are not present in 'lease financing' transactions where, in substance, the 'lease' involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation."

124 Cong.Rec. H 11094 (September 28, 1978); S 17410 (October 6, 1978).

Tennessee's U.C.C., § 47–9–102(2), admittedly governing here, makes Article 9 of the U.C.C. applicable to leases intended as security. Section 47–1–201[37], requiring appraisal of the underlying facts of each case, provides that:

" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation .... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

Starting at square one, and regardless of how the facts of this case might command a result at variance with what was intended, all must agree that the parties intended to and took all the necessary steps to ensure perfection of a security interest.[9] This is not to suggest, however, that if the perfection requirements of the U.C.C. are met, a true lease must inevitably be held to be a secured installment sale. Judges have taught otherwise. See *In re Telemax Corp.,* 12 U.C.C.Rep.Serv. 742, 743 (D.C.S.D.N.Y. 1973). But, inevitably, the court must turn to the words the parties used and the implications to be drawn from them.

As for the purchase provisions of the lease, § 21.02 is clear that the lessee must purchase the leased premises in the event of

**8.** The bill ultimately enacted on November 6, 1978 on President Carter's signature was a re–written H.R. 8200 offered on September 28, 1978 and accepted by the Senate with many October 6, 1978 changes. See 124 Cong. Rec. H 11047, H 11089 (September 28, 1978; S 17404 (October 6, 1978).

**9.** Section 24.01 of Lease A required that:
"This lease . . . shall be recorded in such public office or offices as may be at the time provided by law as the proper place for recordation of a

deed conveying the Leased Premises .... The security interest of the Lessor created by this lease and any supplement thereto in the personal property and fixtures . . . and the assignment of such security interest to the Trustee, shall be perfected by filing . . . in such public office or offices as may be at the time provided by law as the proper place for such filing, of financing statements which fully comply with the Uniform Commercial Code–Secured Transactions."

condemnation, casualty or change in circumstances (*e. g.*, the tax status of bonds) for an amount equal to "All Unpaid Installments of Rent."

Section 21.03 provides that the lessee shall have an option to purchase the leased premises at any time on or after October 1, 1984, for "an amount equal to All Unpaid Installments of Rent plus an amount equal to the fair market value of the Leased Premises as determined by the Lessor and the Lessee . . . . The right to purchase . . . shall be and remain prior and superior to the Indenture and may be exercised whether or not the Lessee is in default . . . provided that such default will not result in nonfulfillment of any condition of this right."

Section 21.04 states that the "Lessee shall have . . . the option to purchase any unimproved part of the Leased Premises at any time . . . for a purchase price equal to $10,000 per acre." Upon delivery of the purchase price, the Trustee was to deposit it in the Bond Redemption Account.

In § 21.05, Win–Tex agreed to purchase "the Equipment described in Schedule B hereto for an amount equal to the fair market value of the Equipment to be determined by the Lessor and the Lessee at the expiration or sooner termination of the Original Term or any additional term hereof following full payment of the Bond Indebtedness . . . ."

Section 4.01 required Win–Tex, as lessee, to pay rental only "until the principal of . . . and interest on the Series A Bonds shall have been fully paid." Once that indebtedness was satisfied, "the Lessee shall not be obligated to make any further rental payments."

Section 4.02 permitted Win–Tex, after October 1, 1984, to pay installments in advance until the bond indebtedness was retired, and by virtue of § 5.01, the lessee's obligation to pay rent until the indebtedness was satisfied was made unconditional.

Under the damage provisions of Article XIX of Lease A, Win–Tex obligated itself, in the event of default, to pay as current damages all unpaid rent and all rent payable under the remainder of the lease until the end of the original term of the lease, on the days on which the rent would otherwise have been payable, minus the proceeds of any reletting by the lessor, but after deduction of the lessor's necessary and incidental expenses incurred in reletting, including repossession costs, brokerage commissions, legal expenses, attorneys fees and expenses, employees expenses, *etc.* Section 19.02.

Alternatively, the lessor reserved the right to recover, upon default by the lessee, as liquidated damages and in lieu of current damages, the basic rent and all additional charges for the remainder of the original term (less the fair rental value of the premises), or, if greater, all unpaid installments of rent if any bond indebtedness should be outstanding. Section 19.02, Leases A and B.

Although these words are not comforting, Winston, as guarantor, takes the position that it is not unusual for a long–term lessee to bear certain risks usually indicative of ownership for such is the nature of a long–term net lease, and that no greater emphasis should be placed on what the parties intended as to this than on the intended compliance with applicable law relevant to perfection of security interests. As this court has no other place to turn, it is inevitable then that it turn to the judicial gloss overlaying this troublesome area.

Apparently, the first and still leading bankruptcy case which characterized a lease as a secured installment sale on facts similar to these at bar was *First National Bank of Chicago v. Irving Trust Co.*, 74 F.2d 263 (2d Cir. 1934) (L. Hand, *C. J.*). There, prior to bankruptcy, the bankrupt corporation, seeking to raise funds to improve certain of its properties, devised a scheme whereby one of its employees would execute a bond issue to be sold to the public. The corporation assigned six properties to the employee who then sublet five back to the corporation. The mortgages on the properties were then assigned to the indenture trustees as security for repayment of the bonds.

The sublease provided that the bankrupt was to make rental payments to the sublessor, to assume the responsibility of performance of all covenants under the leases, and, additionally, to make certain other payments to the sublessor. The court found that these additional payments "corresponded to a cent with the interest and amortization charges" to be made by the sublessor/employee to the Indenture Trustee on the bonds. 74 F.2d at 263. The sublessor retained the power to re–enter and re–let the properties in the event of default, and to charge sublessee with the difference between the rents. When the bankrupt sublessee came into the bankruptcy court, a claim was submitted for all installments due on the bonds, under the provision providing for such payments by the sublessee. On the bankruptcy trustee's objection, the lower courts reduced the claim on the ground that it was for future rent and therefore not a provable claim which could be asserted in bankruptcy as the relevant provision of the 1898 Act then stood prior to amendments in 1934 and 1938 to accommodate claims of landlords for damages flowing from termination of real estate leases by insolvent lessees. For a resume of legislative development anent the claims of landlords in the bankruptcy of their tenants, see 3A *Collier on Bankruptcy* (14th ed.) ¶ 63.32.

The Court of Appeals viewed the issue in terms of "whether the payments were intended to be absolute, regardless of the continuation of the terms, or whether like rents, the obligation ended with the leases." 74 F.2d at 264. The Court concluded that the payments were in fact unconditional obligations, unlike rent, and that the leases were vehicles intended as security for repayment on the bonds, as well as for payment of rent on the properties after it found that the sublessor/employee was merely a dummy pass–through without any financial responsibility for repayment of the bonds. The lower courts were reversed and the claim allowed as a secured claim for, as seen, an unsecured claim could not lie at that time.[10]

In the nearly 50 years since Judge Hand spoke, none can deny the awesome development of commerce, the impact of the tax laws, and, the court supposes, the more refined and subtle ways in which contracts are drawn in order to achieve what each party thinks is best for him. Whether or not lawyers and/or judges have contributed to this last reflection is open. The law applicable to this razor's edge has certainly developed. Whether it has been clarified enough to guide lawyers and their clients is also open. So long as people do not mean what they say or do not say what they mean, there will be enough uncertainty to keep everyone busy hiding intent and obfuscating meaning. Surely gifted lawyers should be able to write plainly in keeping with the needs of their clients. This court cannot improve on Circuit Judge Oakes' observation in *In re Sarex Corp.: Goudeau v. Arzt*, 509 F.2d 689 (2d Cir. 1975), as to the ambiguous language of the law and the role of the bar in eliminating or reducing that ambiguity.

The motives behind, and the phraseologies of, leases intended as installment sales, are as varied as the imagination of the parties can devise.[11] Is there wonder

---

10. The debtor explains this case away as a holding which sought to do justice in some way in light of the then–current state of the law barring any landlord's claim for future rent. If that were the rationale for Judge Hand's result, the opinion gives no inkling that this is so. Indeed, the court carefully distinguished between "rental" payments due and "bond repayments" of interest and principal. It was the claim for the bond payments which the court allowed in full on the ground that the lease was intended as security therefor, and not a claim for future rental payments, which the court distinguished.

The essentials of the transaction described by Judge Learned Hand in *First National Bank of Chicago* retain their vitality and have become institutionalized in present day "net lease financing." See *Net Lease Financing Transactions Under the Proposed Bankruptcy Act* of 1973, Vol. 30, The Business Lawyer, 713 (April, 1975).

11. "Different factors may influence parties to follow the widespread practice of casting what is in substance a secured installment sale into

that judges are mandated to "look at the facts of the case" to determine whether a lease is a true lease or one intended as security for a sale? Unfortunately, "the facts of the case" brings us back to the words used for whatever reason they are so used.

Distinguished commentary in this area notes the spread of confusion where the drafters themselves are unclear as to their intent, or make it appear so, and where courts are divided as to the controlling factors indicating a sale versus a lease. See 1 U.C.C.Serv. Secured Transactions under the U.C.C., Ch. 4A (1980), § 4A.01, fn. 2. Tests generally applied include an evaluation of where "ownership" lies for the term of the transaction, a determination as to whether the purchase price at the end of the term is "nominal", which might indicate an installment sale, or "substantial" which might indicate a true lease with an option to purchase, or whether the transaction falls somewhere in between, thus compelling a court to look elsewhere to make its determination.

The clearest instance of a lease intended as security occurs where the lessee pays, as rental, the full value of the property, plus a profit, and acquires it at the end of the term for a nominal sum (in comparison to the overall "rentals" paid), where financing statements are filed to achieve perfection, and the lessee clearly acquires an equity or pecuniary interest in the property throughout the term of the lease. *In re Royer's Bakery, Inc.*, 1 U.C.C.Rep.Serv. 342 (E.D.Pa. 1963).

■ In the less clear case, the courts look to the economic substance of the transaction to determine the intent of the parties. Where the only sensible option for the lessee is to purchase the property at the end of the term, a lease as security is found to have been intended. *In re Alpha Creamery*

Co., Inc., 4 U.C.C.Rep.Serv. 794 (W.D.Mich. 1967).

Where, however, the purchase option approximates the fair market value of the property at the time of its exercise, a true lease will ordinarily be found, if there are also present, indications that the lessee had been acquiring no equity in the property, and that the rental charges bore a rational nexus to the lessor's compensation for the loss in value to his property from aging, wear and obsolescence. *In re Alpha Creamery, supra.*

In *In re Herold Radio & Electronics Corp.*, 218 F.Supp. 284 (S.D.N.Y.1963), the court looked to the New York Personal Property Law to determine the nature of the transaction in question, and found that to quality as a conditional sale, the contract must require the lessee to pay as compensation a sum substantially equivalent to the value of the goods and it must provide for ownership to pass to the lessee, or provide him with an option to purchase at the end of the term. The court stated, as the prevailing test, whether a lessee is essentially compelled by the economic advantage of the thing to purchase, "[w]here the option price, *i. e.*, the amount to be paid in order to acquire full title at the end of the term, is disproportionately small in comparison with the total rental already paid, it has been held that the contract constitutes a conditional sale." *In re Herold Radio & Electronics Corp., supra*, at 285–286.

But even these tests cannot be taken as controlling. A court must still look to all relevant factors as explained in *All–States Leasing Co. v. Ochs*, 600 P.2d 899, 27 U.S.C. Rep.Serv. 808 (C.A.Oregon, 1979), where the court said that:

"If it were clear that the option price was nominal, that is, that there would be no 'sensible alternative' to the exercise of the option, that factor alone would be

the form of a 'lease' providing for 'rental' payments. The 'lessor' may hope to avoid complying with the Article Nine filing and default provisions. Or the 'lessee' may hope to get a larger federal tax deduction by paying 'rent' than he would were he to buy outright and take

a depreciation allowance as a deduction. Or the 'lessee' may hope to avoid a local tax or local regulation that applies to owners but not lessees."

White and Summers, Uniform Commercial Code (1972) Ch. 22, p. 760.

sufficient to make the lease intended for security. However, the existence of the option in and of itself is not determinative of whether the lease was intended as security.

Therefore, other factors involved in the transaction must be considered. Here, the agreement provides for an acceleration of rental payments in the event of default; the lessee is required to bear the entire risk of loss, to insure the computer, and to pay all taxes imposed upon the equipment; further, the equipment was selected by the lessee, purchased by the lessor specifically for the lessee's use, and was delivered directly to the lessee. Those factors, coupled with the fact that plaintiff fashions itself as a 'financing lessor,' whose only function was to provide the funds for the computer and whose principal concern was to be secured adequately in doing so, lead us to the conclusion that the lease is one which was 'intended for security'." (citation omitted)

En route to examining the facts of this case, the court has examined, in detail, all the elements of the documents described, *supra.* In light of the clearly–stated purpose of the transaction to sell bonds to finance the acquisition of property to achieve the sole end of attracting Win–Tex to do business in Tennessee, to have Win–Tex assume essentially all indicia of ownership, to insist that financing statements and recording deeds be filed, to have Win–Tex agree to pay exactly the amount outstanding on the bonds, plus interest, as its rent, and where, upon repayment of the amount still due on the bonds, further obligations will terminate and Win–Tex could exercise its option to purchase (mandatory in the event of casualty) the properties, but had no other opportunity to terminate, this court has little difficulty in "pierc[ing] through the shell of words", *Sanders v. Commercial Credit Corp.*, 398 F.2d 988, 989 (5th Cir. 1968), in order to find an intended installment sale, with the lease offered as security. Yet, despite all this, the parties here left the court one troubling factor–the provision for payment by Win–Tex of the

fair market value in order to exercise its option to purchase. However, this court's analysis of the cases and commentary on this point leaves it satisfied that a "fair market value" purchase price is not, without more, an insurmountable obstacle to a finding that a lease was intended as security.

Section 1–201(37) of the U.C.C., cited *supra*, sets out the proposition that a provision for payment of a "nominal consideration" is necessary in order for the lessee to acquire ownership of property. Courts have not been uniform as to what constitutes "nominal consideration", holding that anywhere from 1% to 25% of the "reserved rental" is a "nominal" option payment. *National Equipment Rental Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236, 238 (E.D.N.Y. 1977). There, the court pointed out at 234 that "the Code talks in terms of 'nominal consideration' regardless of whether the consideration represents the fair market value or not."

In this dispute, there is evidence that upon sale of the equipment, the machinery was found to have little or no market value, as such was double–knit manufacturing equipment at a time when double–knits are out of favor in the market–place.

Additionally, Lease A provided that Win–Tex could purchase unimproved realty at any time for $10,000 per acre, presumably a fair estimate of market value. In view of the relatively small amount of real property at stake (9 acres is announced in Schedule A to Lease A), the purchase price provided for represents but a relatively small percentage of the total price of the properties acquired under Lease A to be paid for by means of the rentals keyed to repayment of the bonds.

Having overcome this obstacle and having highlighted the other considerations underlying this court's finding, it now concludes, as evidenced by the clear intent of the parties expressed in their own documents, that these leases were truly financing leases intended as security for repayment of the bonds issued and representing

the purchase price of the properties. There are few elements, if any at all, of a traditional true lease of property, and Win–Tex had acquired equity in these properties from and after the effective date of the lease.[12] However, on other fact patterns, skim milk is found to masquerade as cream or vice versa, there was no masquerade here. From claimant UAB's standpoint, it bargained for and got the more fattening beverage.

■ While the legal possibility is valiantly advanced by Winston, there is no compelling evidence in this record to persuade this court that the parties intended, in Lease A, to separate the real estate from the personalty and fixtures. Payments are not, in fact, divided along any such lines. Rather, they are keyed entirely to repayment of the bonds. Economic sense mandates that the whole part–and–parcel be taken together as one given the facts of this case. Thus, the limitations on allowable claims in bankruptcy of landlords resulting from the termination of their lessees' true real estate leases whether under the 1898 Act or the 1978 Code are irrelevant. Lease A, the only lease at issue here involving realty, is not a true lease within either statute.[13]

■ The next issue addressed by the parties is whether the law insists upon a reduction in valuation of the claims for future installments under the liquidated damage clauses of these financing leases. The ap-plicable provision of the "leases" provides for acceleration of "all unpaid installments" of "rent", plus costs. Under this provision, claimants demand payment in full, and predicate this claimed right to full payment on their status as secured lenders as opposed to unsecured lessors. They posit that since they are not parties to true leases, but instead are secured creditors in financing leases evidencing an absolute obligation, it would be improper to discount the payments due to present value.

However, this court disagrees with the validity of this distinction, and finds no difference between recovery under a "financing lease" or recovery under a "true lease". The rationale behind the reduction of payments applies equally to both situations. Furthermore, even assuming *arguendo* there were such a distinction, this court, as a court applying equitable principles, is empowered to reduce such claims on the grounds of equity and fairness to all creditors, including those equally injured but given no more solicitude for their plight than Congress chose to give unsecured creditors. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

In reaching this result, the court is not unmindful of general business practices. A reduction of an award to present value is necessitated by the fact that money presently in hand is always more useful than staggered payments in the future. To al-

12. "The law is likely to be concerned not so much with the lessee's assumption of what should be the lessor's risks as it is with a lessee's obtaining rights more commonly associated with the status of a buyer." Secured Transactions under the U.C.C., 1 U.C.C.Serv. Ch. 4A, § 4A.06[3], at 4A–78.
This has been addressed by the Supreme Court of Tennessee in *U. S. Fidelity and Guaranty Co. v. Thompson and Green Machinery Co., Inc.*, 568 S.W.2d 821, 825 (Sup.Ct.Tenn.1978): "Of course, the intent of the parties is always controlling and is to be ascertained from the whole transaction, not merely from the language employed. In most cases the courts consider whether the payments required of the transferee are in such amounts, spread over such a period of time, and are to be so made that compared with the original value of the property, its depreciation and likely value at the end of the term, that they may be reason-ably considered as compensation for the use of the property or, instead, as payments on an absolute obligation for the purchase price, as in a conditional sale."

13. This conclusion makes it unnecessary for the court to grapple with the nice question of whether the standards of the 1898 Act's provisions anent landlord claims (Section 63(a)(9) in liquidation cases; Section 353 in Chapter XI cases) apply to Winston, a guarantor in Chapter XI of that now–repealed statute, of the debt of Win–Tex, a debtor under the 1978 Code including that statute's different view of the reach of landlord claims in Section 502(b)(7).
It is also unnecessary to deal with the question as to whether Winston's unconditional guarantee could be deemed a waiver of the limitations on landlord claims under either bankruptcy statute.

low a full recovery would, in effect, over—compensate the claimants by the interest earning power of the money in their hands now. See generally 22 Am.Jur.2d Damages § 26.

Such a reduction has been accepted without question and is axiomatic in the determination of future payments of rent reserved in a lease. *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1936); *Hippodrome Bldg. Co. v. Irving Trust Co.*, 91 F.2d 753 (2d Cir. 1937); *In re Union–Fern, Inc.*, 205 F.Supp. 947 (N.D.N.Y.1962).

This court finds no logic in the claimants' insistence that a different theory operates because they secured themselves. Money in hand for use today does not acknowledge the legal status of the spender. It would be antagonistic to the general scheme of equal distribution among all creditors to condone the proffered inequitable scheme. If this court were left only with its general equity power, it alone would dictate a balancing of equities between these claimants and other creditors and mandate a reduction of these claims.

However, as the cases in the area support this view, the court need not rest on this reserve of power. In *In re Mill City Plastics, Inc.*, 129 F.Supp. 86 (D.Minn.1955), aff'd *sub nom. Northtown Theatre Corp. v. Mickelson*, 226 F.2d 212 (8th Cir. 1955), the Eighth Circuit Court of Appeals ruled that where a mortgage was given to secure a fixed sum representing both principal and interest, a clause accelerating maturity will not be enforced except upon cancellation of the unearned interest. That court, quoting from the District Court's decision with approval, stated:

"... in cases like the present, where the mortgage is given to secure a fixed sum representing the aggregate of principal and interest thereon for a period of the mortgage, the rule is that a clause accelerating the maturity of the debt will not be enforced except upon the cancellation of the unearned interest, for to do so would be unconscionable." at 214.

In the case at bar, the claimants concede that the financing lease included interest on the bonds in the semi–annual payments. (See ¶ 8 of Affidavit of Arthur S. Olick, Esq.) The acceleration clause called all payments of "rent", both principal and interest, immediately due upon default. Under the reasoning of *Mill City*, this bars claimants from a full recovery for to so allow would be unconscionable. Claimants are only entitled to file claims for the principal of the debt, exclusive of unearned interest.

The liquidated damage clauses of these financing leases providing for payment of unpaid installments specifically include fees and expenses incurred by the lessors or their assigns and Winston's guarantee recognizes that obligation. Leases A and B, § 19.02; Guarantee, § 2.2.

The parties do not dispute the allowability of such fees and expenses, generally considered a matter of state contract law and presumably permissible under Tennessee law, 3A *Collier on Bankruptcy* (14th ed.) ¶ 63.15(3), nor does it appear that the amount there attributable is in dispute.

The only question, apparently, is whether these costs constitute an additional provable claim, or a portion of the main claim based on the lien, which may first be satisfied out of the proceeds of the sale of the collateral.

The *Mill City* court, *supra*, held that counsel fees incurred in collecting on the mortgage indebtedness were properly allowed "out of the proceeds of mortgaged property sold free of liens by the bankruptcy court, if the mortgage provides for the payment of such fees, even though the services were rendered after the bankruptcy adjudication" adding, 126 F.Supp. at 91, that:

"The Supreme Court has held that the value of such services are allowable, not as a provable claim, but as part of the principal debt which is also secured by a lien upon the property sold–and when by the rendition of services the liability for their reasonable value becomes absolute, the lien becomes enforcible even though this occurs after the adjudication. *Secur-*

*ity Mortgage Co. v. Powers*, 1928, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236."

 Additionally, U.C.C. § 9–504(1)(a) provides some guidance in setting out the priorities applicable to a secured party's disposition of collateral foreclosed after default:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition ... The proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like, and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made ...."

It thus appears to this court that claimant FBM properly deducted its reasonable expenses and attorneys' fees from the gross proceeds of sale of the collateral before applying the net proceeds in reduction of its secured debt; UAB is allowed no less.

This court, having considered the well-drafted and complete papers submitted by both parties, and having heard intelligently–conceived and convincingly presented argument from counsel to both parties, grants the claimants' joint motion for summary judgment, overruling the debtor's amended objection to the claims to the extent described in this decision. The court denies the cross–motion by the debtor for judgment reducing these claims to the extent here described, for it has concluded, as a matter of law, applied to the undisputed material facts, (1) that the leases were financing leases intended as security for installment sales and thus not subject to any limitation applicable to landlord damage claims, and (2) that reasonable fees and expenses are properly deductible from the gross amount of the proceeds received from the sale of the collateral securing the claimants' debts. The debtor prevails in its position that to the extent the claims for future accelerated installments are paid from available proceeds, they are subject to discounting to present value.

Settle order on notice in conformity with the foregoing.