**In re MESA REFINING INC., Gary Refining Company, Inc., Gary Refining Company, Debtors.**

**Bankruptcy Nos. 85 B 01027 M to 85 B 01029 M.**

United States Bankruptcy Court, D. Colorado.

Sept. 4, 1985.

Glenn Merrick, Denver, Colo., for Colorado Nat. Leasing.

Vicki S. Porter, Denver, Colo., for debtors.

## ORDER DENYING MOTION TO COMPEL ASSUMPTION OR REJECTION OF LEASE

JOHN F. McGRATH, Bankruptcy Judge.

Colorado National Leasing, Inc. (CNL) has moved this Court to compel debtor Gary Refining Company (Gary) to assume or reject an unexpired lease between them and for adequate protection. Gary responded, asserting that the lease was in fact a security agreement and was, therefore, not an executory contract or unexpired lease subject to assumption or rejection. After a two-day trial, this Court ruled that the agreement was, in fact, a lease, and granted Gary fifty days in which to decide whether to assume or reject it. Gary has now moved this court to reconsider that order. Having reconsidered, the Court now concludes that its prior ruling was erroneous and that the lease, according to Colorado law, is one intended as security, and that, therefore, 11 U.S.C. § 365 requiring its assumption or rejection is inapplicable.

### Facts

The facts are not in dispute. In 1982 and 1983, Gary undertook an expansion of its refinery in Fruita, Colorado. It purchased an amine plant, a sulfur plant, and certain laboratory equipment, for a total price of $3,009,541.00. The equipment proved to be more costly than Gary had anticipated, and it was unable to fund the purchase price through its traditional lending sources. Therefore, it contacted several leasing companies seeking bids on the terms of a sale and lease-back arrangement. Gary opted for sale and lease-back funding due to the favorable tax consequences and the consequently lowered costs of financing to Gary. Although CNL submitted a bid to Gary, Gary awarded the lease to GATX, who then sold its contract to CNL. CNL is in the business of leasing equipment. It purchases equipment on the request of a lessee and then leases it to the lessee. It is not in the business of manufacturing or selling equipment.

Thus, on April 29, 1983, CNL and Gary entered into an Equipment Lease Agreement, where Gary agreed to lease the equipment from CNL for a period of ten years, with rent consisting of 40 quarterly payments of $107,809.28, for a total rent due under the lease of $4,312,371.20. On September 23, 1983, Gary leased a gasoline blending facility, and had certain adjustments made to the sulfur and amine plants, at a total cost of $1,948,033.00, all as an addition to the original lease funded by CNL. Gary agreed to make quarterly rent payments of $70,145.01 over a period of ten years, for a total rent due of $2,805,800.40. On March 12, 1984, Gary leased a process analyzer, costing $391,259.81 from CNL as a second addition to the original lease. Gary agreed to make quarterly payments of $22,481.79, plus sales tax of $786.86, for a period of five years, for a total rent due

of $449,635.80. Thus, Gary leased equipment which cost a total of $5,348,833.80, and agreed to pay rent over the term of the lease totalling $7,567,807.40. The parties negotiated the amount of the rental payments, taking into consideration the cost of the equipment, the interest paid by CNL to service the debt it incurred in purchasing the equipment, the effective rate of return sought by CNL, its competition, general market conditions, and the cost to Gary were it to obtain conventional financing.

With each lease of equipment, Gary contacted the vendor directly to negotiate the purchase of the equipment, and took title to the equipment in its name. Gary arranged for the installation of the equipment, and had some equipment specially designed for it. It then arranged for the necessary financing through CNL, and the parties executed the appropriate lease documents. Gary then executed a bill of sale, conveying title to CNL. CNL paid Gary, who paid the vendor.

The parties agreed that the lease should be structured as a "tax lease" in compliance with the regulations of the Internal Revenue Service, so that they could receive the contemplated tax and cost benefits. Of particular importance, under the regulations, is a requirement that, should the lessee be given an option to purchase the equipment, the option price reflect the fair market value of the equipment at the time the option is exercised. Therefore, CNL obtained an appraisal of the fair market value at the expiration of the lease, which indicated that the fair market value of the property after ten years would range from 33.3% to 55% of the original purchase price. The parties agreed to option prices ranging from 38% to 55% of the original purchase price on each piece of the equipment.

With regard to the process analyzers, CNL requested that the original agreed term of ten years be shortened to five years so that it could more easily discount that portion of the lease to an investor. Gary agreed to a reduction in the lease term and an increase in the quarterly pay-ments, in return for a reduction in the option price from 38% to 25%.

In addition to the purchase option, the lease contains the following relevant provisions:

1. CNL disclaimed all warranties as to the condition, merchantability, and fitness for particular purpose of the equipment.

2. CNL was held harmless from any loss to Gary for the failure of the equipment to be properly installed, or should the equipment in any other way be defective.

3. Gary provided all maintenance of the equipment.

4. Gary provided insurance coverage, listing CNL as a loss payee.

5. Gary bore all risk of loss to the equipment. Upon destruction of the equipment, Gary was to repair or replace the equipment or to pay a stipulated loss value to CNL. The stipulated loss value was a percentage of the equipment cost, which percentage decreased throughout the term of the lease.

6. Gary bore all cost of taxes, licensing and registration, including sales tax.

7. Upon expiration or termination of the lease, Gary was to return the equipment to CNL, and CNL could resell the equipment, retaining all sales proceeds.

8. Upon Gary's default, CNL could declare all unpaid rent immediately due and payable, terminate the lease and retake possession of and resell the equipment. Gary agreed to pay CNL liquidated damages of all unpaid rent less the fair market rental value of the equipment, plus expenses incurred by CNL in repossessing and reselling the equipment, including attorney's fees.

9. Title to the property remained in CNL, and Gary's interest was expressly limited to that of lessee.

10. Gary agreed to indemnify CNL for any loss in contemplated tax bene-

fits unless occasioned by CNL's actions.

David Younggren, Vice President of Finance and Administration of Gary testified that it was very unlikely that Gary would not exercise its option to purchase the equipment upon termination of the lease, as the equipment would be very difficult to replace and its installation involved massive piping connections, and that Gary had always intended to exercise the option. Two UCC financing statements were filed with the Secretary of State and in the real property records of Mesa County reflecting CNL's interest as lessor, one providing that the equipment was fixtures. Terrence P. Gallagher, a consultant for CNL, testified that there are six to eight sources for the equipment. Ronald Zimmerman, Vice President of CNL, testified that CNL had entered into an agreement with GATX for GATX to assist it in reselling the equipment on termination of the lease.

### Discussion

■ Whether a lease is a true lease or a security agreement for purposes of 11 U.S.C. § 365 is determined by state law. *In re Fashion Optical, Ltd.*, 653 F.2d 1385 (10th Cir.1981); *In re Tulsa Port Warehouse Co., Inc.*, 690 F.2d 809 (10th Cir. 1982). Section 4–1–201(37), C.R.S., (UCC § 1–201(37), in the definition of "security interest", provides:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration, does make the lease one intended for security.

The Colorado Court of Appeals, in *Lease Finance, Inc. v. Burger*, 40 Colo.App. 107, 575 P.2d 857 (1977), recognized that the intent of the parties as determined by the facts of the case control the determination of whether a lease is a true lease or a security agreement. It identified the following factors to be used in determining that a lease is, in fact, a security agreement:

1. The option price is nominal;
2. The lessee obtains equity in the property leased;
3. The lessee bears the risk of loss;
4. The lessee pays the taxes, licensing and registration fees;
5. The lessor may accelerate payment of all rent due upon default;
6. The property is purchased specifically for lease to the lessee;
7. The lease contains a disclaimer of warranties.

Applying those criteria, the court found the lease in question to be a true lease, since there was no option to purchase the property and it was within the parties' contemplation that the equipment revert to the lessor on termination of the lease.

Using the same criteria, the Court of Appeals found a lease to be a security agreement in *HMO Systems, Inc. v. Choicecare Health Services, Inc.*, 665 P.2d 635 (Colo.App.1983). There, Choicecare leased a computer from HMO, which had purchased it from Hewlett-Packard. Choicecare's payments to HMO equalled HMO's payments to its lender, and Choicecare deposited its checks directly into the bank account from which HMO's payments were made. Upon default, Choicecare was liable for the balance of lease payments as liquidated damages. The other factors listed in *Lease Finance* were also present, thus dictating a finding that the lease was a security agreement.

The following additional criteria have been identified by various courts to assist in determining whether a lease is a security agreement:

1. The lessee is responsible for insuring the property;
2. The lessee pays the sales tax;
3. The lessee is responsible for all maintenance and repairs;

*In re Tulsa Port Warehouse Co. Inc., supra;*

4. The lessor is, in truth, a financier;

5. The lessee pays a substantial, non-refundable deposit;

6. The lessee selects the goods from a third party;

7. The goods are fixtures which are impractical to remove;

*In re Loop Hospital Partnership;* 35 B.R. 929 (Bankr.N.D.Ill.1983);

8. The lessor require a personal guaranty of the lease.

*Computer Sciences Corp. v. Sci-Tek, Inc.,* 367 A.2d 658 (Del.1976);

9. Equipment was shipped directly to the lessee;

10. The lessee placed the purchase order for the equipment before contacting the lessor for financing;

11. The lessor did not select or inspect the equipment;

12. Financing statements were signed and recorded;

13. The lease agreement was discounted with a bank or lending institution;

14. Monthly payments were determined by the sales price, sales tax, interest and filing fees;

15. The lessor did not maintain a warehouse for the storage of the equipment

*In re Sherwood Diversified Services, Inc.,* 382 F.Supp. 1359, 15 U.C.C.R.S. 701 (D.C.S.D.N.Y.1974).

In analyzing these factors in this case, the weight falls in favor of finding a security agreement. Here, Gary bore the risk of loss; Gary was responsible for the taxes, licensing and registration fees; CNL had the right to accelerate the rent upon default and could recover attorneys fees for collection; the property was chosen by Gary and was delivered directly to Gary; all warranties were disclaimed in the lease; Gary was responsible for insuring the equipment, naming CNL a loss payee; Gary paid the sales tax; CNL is in the business of leasing equipment and is, in fact, a financier; at least some of the equipment was fixtures and is impractical

to remove; Gary purchased the bulk of the equipment prior to entering into the lease; financing statements were signed and recorded; part of the lease was discounted by CNL to an investor. While the option price reflected the anticipated fair market value of the property upon termination of the lease, the option price of the process analyzers was lowered by the parties when the lease term for that equipment was shortened. No evidence was presented to indicate that CNL maintained a warehouse for storage of the equipment, although it had entered into an agreement with GATX for assistance in reselling it. In contrast, the only factors in favor of finding the agreement to be a true lease are that the option price was the fair market value of the equipment upon termination of the lease and was by no means nominal; Gary obtained no apparent equity in the equipment during the life of the lease; no deposit was paid by Gary; no personal guaranty was required; and the monthly payments did not directly reflect the cost to CNL of obtaining financing of its purchase of the equipment, although that was one factor taken into consideration in their determination.

Some courts have recognized that the obtaining of equity in the leased property and the payment of a nominal option price are the crucial factors in determining that a lease is a security agreement. *See In re Odell,* 27 B.R. 520 (Bankr.Ore.1983); *In re Dunn Bros., Inc.,* 16 B.R. 42 (Bankr.W.D. Va.1981). Other courts have applied a so-called "economic realities" test: if the lessee had no reasonable alternative but to exercise its option to purchase the property, then, assuming other relevant factors are present also indicating the lease to be a security agreement, the court will so hold. *In re Sight & Sound of Ohio, Inc.,* 36 B.R. 885 (Bankr.S.D.Ohio 1983); *In re Winston Mills, Inc.* 6 B.R. 587 (Bankr.S.D.N.Y. 1980); *In re International Plastics, Inc.* 18 B.R. 583 (Bankr.Kan.1982); *In re Pacific Sunwest Printing,* 6 B.R. 408 (Bankr.S. D.Cal.1980). The economic realities test often focuses on the nominal option price

as indicating that the lessee has no reasonable alternative but to exercise the option; see *McGalliard v. Liberty Leasing Co. of Alaska,* 534 P.2d 528, 16 UCCRS 906 (Alaska 1975); *In re Fashion Optical,* supra. It has also been applied, however, where, even though the option price is not nominal, other relevant factors indicate a security agreement was intended.

In *In re Winston Mills, Inc.,* supra, the Industrial Development Board of Cocke County, Tennessee (IDB) wished to promote development in the county. It therefore entered into an agreement with Win-Tex, whereby IDB would purchase land and equipment, and finance the construction of a manufacturing facility, all funded by an issue of revenue bonds. The facility was then leased to Win-Tex, whose payments corresponded to the payments on the revenue bonds. While the option price, the fair market price of the property, was not necessarily nominal, all other factors of the transaction indicated a security agreement rather than a lease. The court examined the economic substance of the transaction, noting that IDB's only function was to finance Win-Tex's acquisition of the facility. Thus, the court concluded the lease was, in fact, a security agreement.

In *In re International Plastics, Inc.,* supra, the court concluded that the economic realities of a transaction may render a lease a security agreement, even though the option price is not nominal. It considered the factors of whether the parties knew that the lessee intended to exercise the option, or that the lessee would not have entered into the lease but for the existence of the option. While the court found that the lease was a true lease, based on the facts present, it recognized the application of the economic realities test.

In *Woco v. Benjamin Franklin Corp.,* 20 U.C.C.R.S. 1015 (D.C.N.H.1976), a large part of the property in question had become affixed to real estate, and would have been significantly reduced in value were it removed from the premises. In fact, the court noted, the cost of removal might exceed its value. Therefore, the lessor could not have intended to remove the property on termination of the lease, nor could the lessee not have exercised its option to purchase it. The option price was lower than the total fair market value of the property at termination. Without the equipment, the hotel in which it was installed could not operate. The court also recognized that the primary reason the transaction was structured as a lease was for the tax benefits. Given these considerations, the court found the lease to be a security agreement.

Finally, in *In re Transcontinental Industries, Inc.,* 3 U.C.C.R.S. 235 (Bankr.N.D.Ga.1965), the facts were very similar to those presented here. There, the lessor sought to have a trustee in bankruptcy assume or reject a lease. The trustee responded by claiming the lease was a security agreement. The court found that the lease was a financing arrangement. The lessee ordered the equipment from the vendor, which invoiced the lessor. The lessee paid for repairs, insurance, taxes, and a security deposit. On default, the lessor could declare all rent immediately due and payable and could recover attorney's fees for its collection. The lease payments reflected the sales price plus seven percent interest per year. While it contained no option to purchase, the lessor typically would sell the property to the lessee for its fair market value. The lease contained options to renew the lease for nominal rental. All warranties were disclaimed. The lessor had no storage facilities and, practically, never retook possession of leased property. The lessee either bought the property or renewed the lease. On these facts, the court found a security agreement.

While the foregoing cases have not involved option prices as substantial as that presented here, the court concludes that a substantial option price will not compel the finding of a true lease if the economic realities of the transaction dictate otherwise. CNL is in the business of financing the acquisition of equipment by its lessees. Gary had every intention of exercising its

option to purchase, and the exercise of the option was reasonably anticipated by CNL. At least part of the equipment has become fixtures and would be very difficult to remove. While Gary could obtain the equipment elsewhere, removal and reinstallation would undoubtedly require a significant shutdown in its operations, were it operating at that time, and a much greater expense to Gary than continued payments to CNL.

While the parties agreed to structure the transaction as a lease, that agreement was merely for tax reasons. As CNL's Vice President, Ronald L. Zimmerman admitted, CNL's role is to provide funding to its lessees for their acquisition of equipment, and that they are "playing games" with the tax benefits to further that end.

Under the economic realities test, the Court finds that the Equipment Lease Agreement between CNL and Gary is, in fact, a security agreement. Therefore, the motion of Colorado National Leasing, Inc. to compel assumption or rejection of the lease and for adequate protection is denied. The order of July 24, 1985, is therefore vacated and set aside.