**In re 48TH STREET STEAKHOUSE, INC., Debtor.**

**48TH STREET STEAKHOUSE, INC., Plaintiff,**

**v.**

**ROCKEFELLER CENTER, INC., Rockefeller Center Properties, I.S.H. Liquidating Corp. and Dornbush, Mensch & Mandelstam, Defendants.**

Bankruptcy No. 83 B 11070 (TLB).
Adv. No. 83–5915A.

United States Bankruptcy Court, S.D. New York.

May 22, 1986.
As Corrected May 28, 1986.

Angel & Frankel, P.C. by Sanford Rosen, Rita Dumain, New York City, for debtor.

William T. Livingston, III, New York City, for Rockefeller Center, Inc. and Rockefeller Center Properties.

Finkel, Goldstein & Berzow by Neal Rosenbloom, New York City, for Creditors' Committee.

Dornbush, Mensch & Mandelstam by Dirk S. Roberts, New York City, pro se and for I.S.H. Liquidating Corp.

## DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT BY PLAINTIFF AND DEFENDANTS ROCKEFELLER CENTER INC. AND ROCKEFELLER CENTER PROPERTIES

TINA L. BROZMAN, Bankruptcy Judge.

Plaintiff 48th Street Steakhouse, Inc. ("48th Street") is the debtor in possession and owner of a ten year old restaurant located in the prestigious Rockefeller Center area. Defendants Rockefeller Center, Inc. (renamed Rockefeller Group, Inc.) ("RGI") and Rockefeller Center Properties ("RCP") are respectively the managing partner of RCP and the owner of the premises at which 48th Street's restaurant is located (collectively, "the landlord").

Plaintiff and defendants have each moved for summary judgment in an adversary proceeding commenced by 48th Street. At the heart of their controversy is the effectiveness of a post-petition three-day notice of termination served by the landlord on I.S.H. Liquidating Corp. ("ISH"), at least nominally the prime tenant of 48th Street's premises pursuant to an assignment of lease executed by 48th Street in conjunction with its 1975 purchase of the restaurant from an affiliate of ISH. 48th Street urges that the notice of termination was violative of the automatic stay of section 362 of the Bankruptcy Code, 11 U.S.C. § 362 (the "Code"), and thereby inadequate to divest 48th Street of its interest in the premises. The landlord counters that the lease has been terminated such that 48th Street cannot compel the landlord's consent

to a reassignment from ISH and therefore cannot assume the lease pursuant to section 365 of the Code.

## FACTS

### 1. Pre-Petition Facts

48th Street purchased its restaurant through a series of transactions which are not unusual to the restaurant business. In November, 1975, 48th Street contracted to buy the restaurant from Charley O's Corp. ("Charley O's"), issuing a promissory note to the seller in the amount of $207,289.00 (the "Note") secured by a lien on 48th Street's chattels, fixtures and equipment. Excluded from the sale was the lease for the premises. 48th Street instead entered into a new lease directly with RGI. That lease, which was dated December 1, 1975 and signed April 7, 1976 [1], expires by its terms on September 30, 1994 (the "Lease"). On the same day that the Lease was signed, 48th Street assigned it to ISH pursuant to an Assignment with Consent ("Assignment") dated December 1, 1975, and executed by 48th Street, ISH and RGI. That Assignment did not release 48th Street of its contractual obligations to RGI. Not only did the Assignment not release 48th Street, but the Lease provided that the majority shareholders of 48th Street were not to change during the period of 48th Street's liability to the landlord. Pursuant to paragraph 6 of the Assignment, contained in a rider, RGI also consented to a reassignment of the Lease to 48th Street whenever requested by ISH and 48th Street and upon presentation of a fully executed reassignment, the form for which was annexed as an exhibit. Specifically, paragraph 6 of the Assignment reads as follows:

> (6) Anything herein or in the lease to the contrary notwithstanding, the landlord will consent to the further assignment of the lease by the Assignee [ISH] to the Assignor [48th Street] whenever requested by the Assignee and the Assignor by

executing and delivering an Assignment with Consent and Release in the form attached hereto as Exhibit A provided that concurrently herewith, such Assignment and Consent and Release is duly executed by the Assignor and the Assignee and the agreement of Restaurant Associates Industries, Inc. [an affiliate of ISH] on the fourth page thereof is duly executed by said Restaurant Associates Industries, Inc.

Unlike the Assignment, the form for this reassignment explicitly released the assignor, here, ISH. At the same time as they executed their Assignment, 48th Street and ISH executed the reassignment which was held in escrow by the law firm Dornbush, Mensch & Mandelstam (the "Dornbush firm"). The escrow, whose terms and conditions were acknowledged in a receipt dated March 24, 1976, was to terminate and the reassignment was to be delivered to 48th Street upon the later of the payment in full of the Note or of all liabilities accruing under the Lease prior to January 1, 1980.[2]

As part and parcel of the transaction, ISH sublet the premises to 48th Street for the period of the escrow. RGI consented, in writing, to the subletting and accepted rent payments directly from 48th Street. In consenting to sublease, RGI required, as in the Lease, that the two majority shareholders of 48th Street remain the same, breach of which covenant would revoke RGI's consent. Both the sublease and the security agreement provided that the payments to be made by 48th Street under the Note constitute additional rent for the use of the subleased premises.

### 2. Post-Petition Facts

On July 22, 1983, when 48th Street filed a voluntary petition under chapter 11 of the Code, it owed substantial rent to the landlord. On August 1, 1983, American Hospitality Management Co. ("American Hospitality"), 48th Street's parent company and

---

1. Four months elapsed because 48th Street had to obtain approval from the New York State Liquor Authority for the sale of liquor at the restaurant.

2. January 1, 1980 was the date on which Charley O's lease would have expired. Restaurant Associates Industries, Inc. guaranteed 48th Street's lease obligations until this date.

co-debtor, tendered to RGI use and occupation for the post-petition period of July. That tender was rejected.[3]

On approximately August 29, 1983,[4] over a month after the bankruptcy case was commenced, the landlord delivered to ISH a written notice of default which provided that in the event that the arrears were not paid within five days, a written notice would follow which would provide that the Lease would be terminated in three days. Soon thereafter, during the morning of September 1, the promised notice followed, a copy going to 48th Street.

In an effort to protect its interests in the Lease, 48th Street commenced an adversary proceeding against RCP, RGI, ISH and the Dornbush firm. 48th Street sought to enjoin the landlord from taking any actions respecting 48th Street's Lease and sublease rights, to compel RGI to accept 48th Street's use and occupation payments, and to obtain a declaration that it was the prime tenant under the Lease. Alleging that all Note payments had been made, 48th Street also sought to compel the Dornbush firm to release the reassignment. In the event that the court did not find 48th Street to be the prime tenant, 48th Street sought alternatively a declaration that, upon full payment to ISH to be fixed by the court, 48th Street will become the prime tenant.

48th Street's efforts were not limited to commencement of the adversary proceeding. By order to show cause signed September 1, 1983, 48th Street moved for a) authorization to assume the Lease; b) a finding that the landlord was in contempt for violating the automatic stay; and c) a

declaration that 48th Street has the right to make the Lease payments so it may be reinstated as prime tenant under the Lease. Contained in that order to show cause (obtained during the afternoon of September 1 after a hearing on notice to the landlord) was an order enjoining the landlord from "interfering with and/or terminating any right, title and interest that the Debtor may enjoy with regard to the lease or premises." The landlord later sought to vacate this September 1 injunction; the motion was denied by order dated January 3, 1984. Various appellate rulings emanated from the second of the two orders.[5] On January 29, 1985, the district court held that the September 1 injunction was a preliminary one rather than a temporary restraining order, as the landlord had contended, but granted the landlord's motion for leave to appeal the January 3 order.[6] Eventually the district court affirmed the January 3 order denying the landlord's motion to vacate the September 3 order.[7]

During the pendency of the proceedings before the district court, 48th Street entered into a court-approved settlement of its adversary proceeding against ISH and the Dornbush firm, paving the way for the parties to eventually "put" the reassignment to RGI, unless the Lease has been validly terminated.

### THE INSTANT MOTIONS

Pursuant to Fed.R.Civ.P. 56(a) and Fed.R.Bankr.P. 7056, 48th Street seeks summary judgment against the landlord declaring that a) the default and termination notices issued by the landlord were ineffective because they violated the automatic stay provisions of § 362 of the Code; b) alternative-

---

**3.** There may have been a second tender, one month later, which was similarly rejected, but the dispute regarding that alleged tender is not relevant and need not be resolved here.

**4.** It is not clear from the record whether this notice was delivered on August 29 or August 26, 1983. Defendants' statement pursuant to Rule 3(g) of the Civil Rules for the Southern District of New York ("3(g) statement") admits the correctness of the later date, but their moving papers indicate that the earlier date is the correct one.

**5.** Both orders were entered by Judge Ryan of this court who was assigned the case until his resignation. The first order was never appealed.

**6.** *See* Memorandum and Order dated January 29, 1985, Index No. 84 Civ. 1241 (S.D.N.Y., MacMahon, J.).

**7.** *See* Memorandum and Order dated July 12, 1985, Index No. 84 Civ. 1241 (S.D.N.Y., MacMahon, J.).

ly, the September 1, 1983 injunction served to prevent the termination of the Lease such that 48th Street's interest in the Lease and/or sublease has not terminated; and c) upon payment of all arrears due and owing under the Lease and/or sublease, 48th Street will be the prime tenant. The landlord has cross moved for partial summary judgment declaring that 48th Street is not the tenant under the Lease, has not been a party to the Lease since July 22, 1983 and did not, by filing its petition on that date, invoke any law that would enjoin or stay the effectiveness of the notices served by the landlord upon ISH.[8]

48th Street contends that (i) the Assignment was given as collateral to secure its obligations under the Note so that the Lease itself constitutes property of 48th Street's estate protected by the automatic stay; (ii) the sublease is property of the estate protected by the automatic stay; (iii) the September injunction prevented the termination of the Lease; and (iv) 48th Street is free to cure its defaults and thereafter assume the Lease pursuant to section 365 of the Code. In opposition, the landlord

argues that the automatic stay did not bar the landlord from terminating the Lease with ISH and that the September injunction did not prevent the termination of the Lease because the three-day notice was mailed prior to the issuance of the injunction.

## DISCUSSION

Having read the affidavits and briefs in support of the cross motions and having considered the parties' oral arguments, this court finds that the notices were issued in violation of the automatic stay and that the September injunction served to maintain the status quo of the Lease pending 48th Street's assumption application. Additionally we hold that the Assignment was designed only to serve as collateral for the Note obligation and thus was not a "true lease assignment," such that 48th Street was thereby divested of its interest in the Lease.

### 1. Automatic Stay Violations

Whether 48th Street's interest in the premises is that of a subtenant, as the

---

**8.** In its third cross-claim and counterclaim, the landlord requests judgment declaring the Lease and sublease void or permitting it to terminate the Lease and obtain damages because the ownership of 48th Street was allegedly misrepresented, concealed or impermissibly changed. Although the landlord bases its summary judgment motion and its opposition to 48th Street's motion seeking to be declared the prime tenant on the claimed termination of the Lease, it limits its argument for termination to the effectiveness of the termination notice, nowhere raising the grounds for termination or avoidance pleaded in the third counterclaim. Not only are the landlord's motion papers and memorandum of law conspicuously silent with respect to this defense to 48th Street's motion (which was not addressed at oral argument, either), but the landlord's 3(g) statement fails to raise as an undisputed factual issue that the ownership of the debtor was misrepresented, concealed or impermissibly changed.

The very mission of the summary judgment motion is to pierce the pleadings and assess the proof in order to see whether there is a need for a trial. Advisory Committee Note on 1963 amendment to subdivision (e) of Rule 56; *Alithochrome Corporation v. East Coast Finishing Sales Corporation (In re Alithochrome Corporation)*, 53 B.R. 906, 912 (Bankr.S.D.N.Y.1985). The party opposing a summary judgment mo-

tion "may not rest upon mere allegations or denials. Fed.R.Civ.P. 56(e). To avoid summary judgment ... a plaintiff must do more than whet the curiosity of the court; he must support vague accusations and surmise with concrete particulars." *Varon v. Trimble, Marshall & Goldman, P.C. (In re Euro-Swiss International Corporation)*, 33 B.R. 872, 878 (Bankr.S.D.N.Y. 1983), quoting *Applegate v. Top Associates*, 425 F.2d 92, 96 (2d Cir.1970). If evidence is available to underpin a conclusory statement, rule 56 requires the party opposing a motion for summary judgment, which is intended to "smoke out" the facts, to come forward with it. *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir.1972). Thus the third counterclaim need not detain us.

In its fourth counterclaim and affirmative defense, the landlord requests dismissal of 48th Street's petition. The landlord essentially asserts that the bankruptcy filing was made in bad faith in that the debtor is profitable, is productive, was not insolvent at the time it filed its petition and is not likely to become insolvent. The dismissal sections of the Bankruptcy Code, 1112(b) and 305(a), require notice and a hearing when a party requests such relief. Federal Rule of Bankruptcy Procedure 2002(a)(5) requires twenty days' notice to, *inter alia*, the debtor and all creditors. The landlord has not given that notice. Thus, the issue is not properly before this court.

landlord urges, or that of an equitable owner, as the debtor urges, the automatic stay was in any event violated when the landlord served upon ISH and the debtor default and termination notices.

 Section 362(a)(3) of the Bankruptcy Code operates as a stay against "any act to obtain possession of property of the estate or property from the estate."[9] By virtue of section 541, which is meant to be read broadly, the commencement of a case creates an estate comprising all the debtor's legal and equitable interests. 11 U.S.C. § 541; *see United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). The estate is not confined to property owned by the debtor, for a leasehold or a mere possessory interest falls within section 541. *Carls v. Bonanza International Development Company (In re Allan Steaks Corporation)*, 22 B.R. 881, 882 (Bankr.D.Mass.1982) *citing* H.Rep. No. 95-595, 95th Cong. 1st Sess. 367 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 82 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. That 48th Street's interest is arguably limited to that of a subtenancy is of no consequence since a sublease is sufficient to constitute property of the estate protected by the automatic stay. *See Colonial Village Meat Market Leasing, Inc. v. Andorra Meat Market (In re Andorra Meat Market)*, 7 B.R. 744 (Bankr.E.D.Pa.1980). Moreover, a mere possessory interest enjoys the protection of the automatic stay. *In re W.A.S. Food Service Corp.*, 49 B.R. 969 (Bankr.S.D.N.Y.1985); *In re GSVC Restaurant Corp.*, 3 B.R. 491, 494 (Bankr.S.D.N.Y.), *aff'd*, 10 B.R. 300 (S.D.N.Y.1980); *In re Onio's Italian Restaurant Corp.*, 42 B.R. 319 (Bankr.S.D.N.Y.1984).

 That the landlord served the notices on ISH, rather than 48th Street, does not insulate the landlord. Indisputably, the landlord's actions were intended to obtain for it by indirection that which it recognized it could not obtain directly—recapture of the premises in which 48th Street had an interest. But that effort cannot be allowed to succeed, for section 362(a)(3) stays not only acts to obtain "property of the estate" but acts to obtain "property from the estate" and the attempt to wrest possession of property away from a debtor without the imprimatur of the bankruptcy court is therefore proscribed. The legislative history is ample testimony to Congress' intention to protect interests other than fee simple title.

> Paragraph (3) stay any act to obtain possession of ... property from the estate (property over which the estate has control or possession).

H.R. No. 95-595, 95th Cong. 1st Sess. 340-2 (1977); S.R. No. 95-989, 95th Cong. 2nd Sess. 49-51 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5836, 6298.[10] *See also Superior Propane v. Zartun (In re Zartun)*, 30 B.R. 543, 545 (B.A.P. 9th Cir. 1983); *Turbowind v. Post Street Management, Inc.*, 42 B.R. 579 (Bankr.S.D.Cal. 1984).

Since 48th Street had a ten-year-old possessory interest in the premises as well as, at a minimum, the interest of an assignor and sublessee in those premises, 48th Street necessarily enjoyed the freedom from dismemberment afforded by the automatic stay. And the landlord's actions were therefore violative of the stay. *See A. Dan Chisholm Inc. v. B.P. Oil Inc. (In re A. Dan Chisholm)*, 57 B.R. 718, 720 (Bankr.M.D.Fla.1986) ("If defendant's attempt to terminate the leased franchise constituted an act to obtain or to exercise control over the [leased premises] then this action violated the stay injunction").

---

**9.** Section 362(a)(3) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 which amendment is inapplicable here. *See* note 10 *infra*.

**10.** The Bankruptcy Amendments and Federal Judgeship Act of 1984, not applicable to the instant case, amended the Code to codify this legislative history. Section 362(a)(3) now reads:

> (3) any act to obtain possession of property of the estate or of property from the estate, or to exercise control over property of the estate.

188

The landlord makes much of the argument that the automatic stay is not intended to afford injunctive coverage to nondebtor third parties. Although that concept is certainly well grounded, it is not dispositive here. See *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194 (6th Cir.1983); *Pitts v. Unarco Industries, Inc.*, 698 F.2d 313 (7th Cir.1983); *GAF Corp. v. Johns-Manville Corp. (In re: Johns-Manville Corp.)*, 26 B.R. 405 (Bankr.S.D.N.Y.1983), *aff'd*, 40 Bankr. 219 (S.D.N.Y.1984) (refusing to grant requests of solvent co-defendants of debtor that automatic stay protection extend to them in existing litigation); *Fintel v. State of Oregon (In re Fintel)*, 10 B.R. 50 (Bankr.Or.1981); *Globe Construction Co. v. Oklahoma City Housing Authority*, 571 F.2d 1140 (10th Cir.1978) (denying requests by debtor's surety for automatic stay protection); *In re Larmar Estates Inc.*, 5 B.R. 328 (Bankr.E.D.N.Y.1980) (loan guarantors of debtor not protected); *Bank Center Ltd. v. Papariella (In re Bank Center Ltd.)*, 15 B.R. 64 (Bankr.W.D.Pa. 1981) (individual partners not extended automatic stay coverage when partnership was debtor); *but cf. Elemar Associates v. Goldsmith (In re Elemar Associates)*, 3 B.R.Ct.Dec. 958 (Bankr.S.D.N.Y.1977) (individual partners granted injunction protecting their assets so as not to jeopardize reorganization).[11]

In certain unusual circumstances, a third party may gain protection of the stay as an incidental result of the protection afforded

estate property. In recognizing this, one court aptly stated:

> Where, however, a debtor and a nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited by the Code....
>
> Clearly the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate.

*Plessey Precision Metals, Inc. v. Metal Center, Inc. (In re Metal Center, Inc.)*, 31 B.R. 458, 462 (Bankr.D.Conn.1983).[12] *See also Harsh Investment Corp. v. Bialac (In re Bialac)*, 712 F.2d 426, 432 (9th Cir.1983) ("Neither of these interests are within protections afforded by a literal interpretation of section 362, yet they should be protected by the stay if the purposes of the Act, the orderly disposition of all property in which the debtor has some interest, are to be achieved").

Application of the automatic stay to a debtor/assignor/sublessee in possession is not inconsistent with the line of cases previously cited and offered by the landlord that nondebtor parties are not afforded stay protection. Scrutiny of those cases reveals that in no instance was the *debtor's* property in jeopardy; rather, the relief requested was intended to garner the salutary effect of the automatic stay for a nondebtor entity.[13] But here the peril to

11. The case of *In re Autobahn Classics, Inc.*, 29 B.R. 625 (Bankr.S.D.N.Y.1983), upon which the landlord heavily relies, is indistinguishable from the case at bar. In *Autobahn,* the lessor sought to lift the stay to enforce a then existing eviction order against a principal of a debtor corporation and of a debtor partnership. Although it appeared there that the debtors conducted their businesses from the premises, the debtors never had any lease, leasehold interest or other relationship with the lessor nor were the debtors paying rent to the lessor. In fact, at the time the lease was issued, the debtor partnership was not even in existence. In the instant case, 48th Street has an assignment and sublease agreement approved by the landlord and has paid rent directly to the landlord for close to ten years.

But even in *Autobahn,* the lessor sought court approval to lift the automatic stay and did not *directly proceed against what was questionably* estate property.

12. The *Plessey* court properly notes that the stay is subject to the relief provisions under section 362(d). However, the debtor was held to be initially entitled to the stay protection.

13. Recently, a bankruptcy court was faced with an issue similar to the one here. In *Juneau's Builders Center, Inc. v. First National Bank of Gonzales (In re Juneau's Builder's Center, Inc.)*, 57 B.R. 254 (Bankr.M.D.La.1986), the debtor sought damages for a mortgagee's alleged violation of the automatic stay in pursuing a foreclosure action on mortgaged premises of which

the debtor is manifest for it is axiomatic that, under New York law, when a prime lease falls, so does the sublease. 34 N.Y. Jur., *Landlord and Tenant* § 270 (1964); *In re Shopper's Paradise, Inc.* 8 B.R. 271, 275 (Bankr.S.D.N.Y.1980).

In holding that the automatic stay prohibited the landlord from terminating the Lease, this court has as its only concern the estate's interest in that Lease, which interest, in whatever form, is estate property. That ISH may benefit is a consequence of this court's holding, not a motivation for it. The important goal of the automatic stay, to afford protection to the debtor and its property, should not be sacrificed where its implementation necessarily entails protecting an entity which the stay is not designed to benefit.

■ Viewing the debtor's interest in the premises as that of an equitable owner because of the argued collateral assignment, the automatic stay was in any event violated when RGI served the notices. This is so because a debtor's assignment of property for collateral purposes does not divest the debtor of all interest in the property. Thus, the automatic stay is triggered. *See State of West Virginia v. Has-*

*sett (In re O.P.M. Leasing Services, Inc.),* 21 B.R. 993, 1004 (Bankr.S.D.N.Y.1982); *First National Bank of Louisville v. Hurricane Elkhorn Coal Corporation II (In re Hurricane Elkhorn Coal Corporation II),* 19 B.R. 609 (Bankr.W.D.Ky.1982), *mod.,* 32 B.R. 737 (W.D.Ky.1983), *aff'd,* 763 F.2d 188 (6th Cir.1985); *see also In re M.J. Sales & Distributing Company, Inc.,* 25 B.R. 608 (Bankr.S.D.N.Y.1982) (in connection with collateral pledged as security for a letter of credit, collateral is still estate property subject to automatic stay); *In re Taslis,* 41 B.R. 47 (Bankr.D.Mass.1984) (rights are retained in a collateral assignment of a lease by a debtor, i.e., the right of possession as well as the right to discharge the assignment upon payment of the obligation).

Having established that the stay has been violated, it follows without discussion that those acts taken in violation of section 362 are void. *See In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984); 2 L. King, *Collier on Bankruptcy* § 362.11 (15th ed. 1984) and cases cited therein. Thus, the default and termination notices were without effect.[14]

the debtor was a lessee. The court there found that "[s]ince there was no act or an action against the debtor, against property of the debtor, or against property of the estate, there was no violation of the stay". *Id.* at 256 (footnote omitted). In a footnote the court clarified that the foreclosure was not a *per se* stay violation and that it was not then deciding whether "a subsequent eviction without relief from the stay would have constituted a violation of the stay...." *Id.* at fn. 2. It would appear from the decision of the court that the mortgage foreclosure would not affect the debtor's interest in the property.

**14.** Automatic stay violation aside, the district court has already affirmed the bankruptcy court's refusal to vacate the injunction and has determined that the injunction prevented defendants from terminating 48th Street's interest in the Lease pending a determination of 48th Street's application to assume that Lease. *See* footnotes 6 and 7, *supra.* Unless and until the circuit court of appeals rules otherwise, we assume the continuing validity and effectiveness of the injunction. We note that the injunction appears to have been indisputably intended to prevent the debtor's forfeiture of its interest in the Lease. The minutes of the hearing before

Judge Ryan bear out this interpretation of the injunction, Tr. of September 1, 1983 at 7–8, which is in harmony with the well-established principle that "the purpose of a preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985) *citing Diversified Mortgage Investors v. U.S. Life Title Insurance Company of New York,* 544 F.2d 571, 576 (2d Cir.1976); *Triebwasser & Katz v. American Telephone & Telegraph Company,* 535 F.2d 1356, 1360 (2d Cir.1976).

Because the attempted termination of the Lease via the sending of the termination notice violated the automatic stay, the injunction may have been unnecessary, but, in any event, it served to prevent the termination of the Lease. *See generally In re Amber Lingerie, Inc.,* 30 B.R. 736 (Bankr.S.D.N.Y.1983); *In re Merritt Lumber Co.,* 336 F.Supp. 325 (E.D.Pa.1971) (both courts enjoining cancellation/termination of an insurance contract after the sending of notices analogous to that sent by the landlord here); *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968); *Lewis v. Clothes Shack, Inc.,* 67 Misc.2d 621, 322 N.Y.S.2d 738 (Sup.Ct. App.T.1971) (cure permissible up until moment

## 2. Collateral Lease Assignment

■ Recognition of the distinction between "true" real estate leases and so called "financing leases" or "leases intended as security" is not at all new to the bankruptcy arena.[15] *See First National Bank of Chicago v. Irving Trust Co.,* 74 F.2d 263 (2d Cir.1934); *In re Winston Mills,* 6 B.R. 587 (Bankr.S.D.N.Y.1980). *See also* Albenda & Lief, *Net Lease Financing Transaction Under the Proposed Bankruptcy Act of 1973,* 30 Bus.Law. 713 (1975). The phraseology of the documents should not be ignored, but the court should examine the economic substance of the transaction to determine whether there is in fact a "true lease." *See In re Cobham Enterprises, Inc.,* 62 B.R. 191 (Bankr. S.D.N.Y.1986) (Buschman, J.); *In re Winston Mills,* 6 B.R. at 596–97. In *Winston Mills,* the court had "little difficulty in piercing through the shell of words" to find that the disputed lease was one intended for security. *Id.* at 598.

■ Congress was not blind to the economic realities which have led to the use of a lease as a financing device or as collateral security. The legislative history to section 502 of the Code, which limits the damages which a landlord may claim, makes clear the Congressional intention that the limitation be applied to only true leases, with the determination that a lease is a true one to turn on the circumstances of each case and the economic substance of the transaction, not on the locus of title, form of transaction or the mere labelling as a lease. *See* 124 Cong.Rec.H. 11, 093–94 (Sept. 28, 1978); S 17, 410 (Oct. 6, 1978). After a review of the pertinent documents and undisputed facts, the conclusion that 48th Street's assignment of its Lease to ISH was for collateral purposes is inescap-

able. *See Cobham Enterprises, supra,* slip op. at 6–7, (Judge Buschman noting that the giving of a Lease as security is "so typical of sales of restaurants in New York"); *see also Anjo Restaurant Corp. v. Sunrise Hotel Corp.,* 98 Misc.2d 597, 414 N.Y.S.2d 265 (Sup.Ct.Nass.Co.1979). Interestingly, the landlord does not really quarrel with the conclusion but instead asserts that it should not be bound by the transactions between 48th Street and ISH because of its ignorance of those transactions. Its protrayal of the unknowing landlord is unconvincing. To highlight, we turn now to the facts.

On the very *same day,* the landlord executed: 1) the Lease to 48th Street; 2) the Assignment allowing 48th Street to assign that Lease to ISH and requiring the landlord to permit a reassignment back to its original tenant whenever ISH and 48th Street so requested; and 3) a consent to allow ISH to sublease the premises back to 48th Street. Significantly, the Assignment to which the landlord consented did not release 48th Street from its contractual obligations under the Lease yet the escrowed reassignment (the form of which was required by the landlord in the Assignment) did release ISH, leading one to conclude that the landlord surely intended its association with ISH to be temporary with 48th Street remaining as its actual tenant. Moreover, in the consent to sublease the landlord provided that the two majority shareholders of 48th Street remain the same, breach of which covenant would revoke the consent. Consonant with our reading of the unambiguous documents are the facts that ISH never took possession of the premises and never paid rent. For the past ten years, it has been 48th Street which has performed under the Lease. Thus, the landlord's claim that, in its eyes,

---

of expiration of three-day notice of termination).

**15.** The distinction has been similarly explored in the personal property context. *See* I. Jones, *Lease or Secured Transaction—The Saga Continues Under the Bankruptcy Act,* Comm.L.J. 281 (June/July 1985) and cases cited therein; *In re Mesa Refining Inc.,* 52 B.R. 359 (Bankr.D.Colo.

1985); *In re Ram Manufacturing, Inc.,* 56 B.R. 769 (E.D.Pa.1985), *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482 (9th Cir.1986); *The Bank of New York v. Olympia & York Florida Equity Corp. (In re Holywell Corp.),* 51 B.R. 56 (S.D.Fla. 1985).

ISH was its real tenant comes ten years too late and flies in the face of the documents which it executed.

That the landlord may not have been privy to the finer points of the sale of the restaurant business, including the terms of the actual sublease, is of no great moment, for the transactions which the landlord facilitated and in which it participated paint a picture of the relations among the parties. Although the landlord surprisingly did not cite us to *Anjo Restaurant Corp. v. Sunrise Hotel Corp., supra,* 98 Misc.2d 597, 414 N.Y.S.2d 265, there is support there for an argument that a landlord who has no knowledge of the continuing relationship between an assignor and assignee of a lease is not bound by the provision in a security agreement between those parties which allows the assignor to reenter the premises upon the assignee's default and obtain a reassignment of the Lease. But the *Anjo* court made clear that its determination was predicated upon three factors, none of which is present here, first, that the landlord's consent to a future reassignment was never obtained (the consent to assignment providing, in fact, that any future assignment would require the landlord's written consent), second, that the landlord was not made aware of the existence of the security agreement between the assignor and assignee which purported to grant the rights to reenter and obtain a reassignment, and third, that the landlord had no knowledge that the assignor claimed to be an interested party. Careful review of *Anjo* serves to reinforce our conclusion that 48th Street is the equitable owner of the Lease.[16]

Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by virtue of Fed.R.Bankr.P. 7056, provides for the granting of summary judgment where

there exists no genuine issue of material fact and the moving party is entitled to such judgment as a matter of law. *Beyah v. Coughlin,* 789 F.2d 986 (2d Cir.1986); *Nahtel Corporation v. West Virginia Pulp & Paper Co.,* 141 F.2d 1 (2d Cir.1944). The material facts are undisputed. The documents are unambiguous. The intent is clear. *Cf. Bank of America National Trust and Savings Association v. Gillaizeau,* 766 F.2d 709 (2d Cir.1985). Because the attempted termination of the Lease was without effect and because the assignment was one made as collateral, 48th Street was and remains the equitable owner of the Lease. Accordingly we grant 48th Street's motion for summary judgment in full and deny the landlord's cross motion for partial summary judgment.

IT IS SO ORDERED.

---

16. Resolution of this tenancy issue is no doubt intended to form the necessary underpinning for eventual lease assumption under 365 of the Code. But the parties may have travelled a needlessly long route. For in categorizing 48th Street as a *sublessee,* the landlord conveniently ignores the debtor's status as the original tenant under and assignor of the Lease. While lease assignment terminates privity of estate, it does not affect privity of contract, 34 N.Y.Jur. *Land-* *lord and Tenant* § 243 (1964), particularly where, as here, there has been no release. *Id.* at §§ 241, 243. And privity of contract alone gives rise to eligibility to assume a lease, *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc. (In re Allied Technology, Inc.),* 25 B.R. 484, 494 (Bankr.S.D.Ohio 1982), especially where the debtor has been in possession of the premises for a continuous ten year period.